Filed 2/16/16  P. v. Wu CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JING HUA WU,<br><br>    Defendant and Appellant. | H040066<br>(Santa Clara County<br>Super. Ct. No. 211490) |

Defendant Jing Hua Wu was fired from his job as an engineer at SiPort, Inc., a technology firm in the City of Santa Clara.  After he was fired, defendant returned to his workplace with a semiautomatic pistol and shot to death three coworkers:  CEO Sid Agrawal, Office Manager Marilyn Lewis, and Vice President of Operations Brian Pugh.  A grand jury indicted defendant on three counts of murder.  (Pen. Code, § 187.)[1]

Defendant entered pleas of not guilty and not guilty by reason of insanity.  After trial, a jury found defendant guilty of first degree murder on all three counts.  The jury also found true a multiple-murder special-circumstance allegation and three firearm enhancements.  (§§ 190.2, subd. (a)(3), 12022.53, subd. (d).)  In the sanity phase of the trial, the jury found defendant sane as to all three counts.  The trial court imposed an aggregate term of life without the possibility of parole consecutive to 75 years to life.

---

[1] Subsequent undesignated statutory references are to the Penal Code.

Defendant raises three claims on appeal. First, he contends the trial court erroneously instructed the jury on the elements of "heat of passion second degree murder." Specifically, he contends the court failed to instruct the jury that provocation sufficient to reduce first degree murder to second degree murder does not require the objective component that is required for voluntary manslaughter under heat of passion. Second, he contends the trial court erred by allowing the prosecution's mental health expert to administer the Minnesota Multiphasic Personality Inventory 2 test without finding the test bore a "reasonable relation" to the issue of defendant's state of mind. Third, he asserts misconduct in the prosecution's closing argument during the sanity phase of the trial. In the alternative, defendant raises claims of ineffective assistance of counsel in connection with each of these claims.

We conclude defendant's claims are without merit. Accordingly, we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts of the Offenses*

#### 1. *Overview*

SiPort, Inc. (SiPort or "the company") designed high definition digital radio chips. SiPort hired defendant as a lead test and product engineer in 2006. In 2008, defendant's supervisors became dissatisfied with his performance and decided to terminate his employment. On the morning of November 14, 2008, Vice President of Operations Brian Pugh and Office Manager Marilyn Lewis held a meeting with defendant to inform him of the company's decision to terminate his employment. In an email Pugh wrote to document the meeting, Pugh noted that defendant had told him: "You will pay for this. You will see. I wish you go to hell. You will not escape from earth."

After lunch, defendant left the building and drove to a shooting range where he purchased two 50-round boxes of ammunition for his nine-millimeter semiautomatic

2

pistol. He then went to his credit union, where he deposited several checks and withdrew $3,000 in cash.

At around 3:00 p.m., defendant returned to SiPort wearing a coat and hat. Defendant had the loaded pistol in his pocket. About 45 minutes later, defendant went to the office of Chief Executive Officer Sid Agrawal, who was meeting with Pugh. Lewis followed defendant into the office. After a brief verbal exchange, defendant fired six shots, killing Agrawal, Lewis and Pugh.

Defendant then exited the building and walked calmly to his car.[2] He called his wife to tell her she would have to care for their children because he would be gone. He then turned off his cell phone. He returned to the credit union, deposited another check, and withdrew another $2,000 in cash. He attempted to withdraw $40,000, but the bank declined his request. Defendant spent the night in his rental car and called his wife in the morning. He apologized and told her he wished to surrender to police, but he did not reveal his exact location. Police arrested him a short time later.

At trial, defendant testified that, after he had been fired, he had entered SiPort with the intent to commit suicide, not to shoot anyone else. He claimed that, at the time of the shootings, he had fallen into a dream-like mental state and suffered a flashback that he was being pushed into water and drowned. He asserted that he fired the first shot in Agrawal's office inadvertently, and that he could not recall firing the subsequent shots. He blamed his mental state on childhood trauma he had suffered amidst the harsh conditions of his upbringing in China during the Cultural Revolution.

Several mental health experts testified in the guilt and sanity phases of the trial. Defendant's expert testified that defendant had suffered from a psychotic break from reality at the time of the shootings and that he was therefore legally insane. The prosecution's expert testified that defendant was malingering and exaggerating his

---

[2] Defendant had been in a car accident about a week earlier and was driving a rental car.

3

psychotic symptomology.  The prosecution's expert opined that defendant was legally sane at the time of the shootings.  Two court-appointed experts also testified.  The first court-appointed expert opined that defendant had suffered from a dissociative disorder that caused him to become detached from reality at the time of the shootings and he was therefore legally insane.  The second court-appointed expert testified there was no evidence showing defendant had suffered from any kind of psychotic break or dissociative disorder at the time of the shootings and defendant was therefore legally sane at the time of the offense.

2. *Defendant's Life History*

Defendant was born in 1961 in the city of Nanjing in the Jiangsu province of China.  The Cultural Revolution began when he was five years old.  According to defendant and his sister, their lives were difficult in the years following the Cultural Revolution.  The economy had collapsed and defendant was forced to forage for food in the wild.  Defendant's father was labeled a capitalist, and his mother was considered a traitor and a spy.  Defendant's parents were publicly humiliated and paraded in the streets while others threw stones at them.  Defendant's mother and grandmother exhibited signs of mental illness, and his father had suffered a serious injury during the war with Japan.  When defendant was around four years old, his mother went to a sanitorium.

Defendant was bullied along with his parents.  He was assaulted and spat upon many times.  Another child once shoved him into a ditch filled with feces.  Defendant lived in fear and experienced nightmares about being bullied and humiliated.  He felt his family was powerless to help him and he did not trust his teachers.  Defendant described a formative experience in which an older bully wrapped him up with a rope and threw him into a swimming pool.  Defendant struggled to pull himself out of the pool but had inhaled a great deal of water.  Defendant was about 10 years old at the time.

After the Cultural Revolution, defendant entered college.  He testified that he continued to have nightmares and flashbacks from his childhood.  Nonetheless, defendant

4

earned very good grades, and in 1982 he graduated with a bachelor's degree in electrical engineering.  In 1989, after working for several years, he left China for Germany.  He did not feel welcomed in Germany, so he moved to the United States nine months later.  He entered graduate school at Santa Clara University and earned his masters degree in electrical engineering in 1994.

Defendant married Jie Zheng in 2002, and the couple had three children—twin boys in 2002, and another son in 2006.  In 2003, defendant and his wife began investing in real estate.  By the end of 2007, the couple owned nine rental properties in three states.  They went into debt to purchase the properties, but upkeep was expensive and the properties did not provide the expected income.  In 2007, defendant lost $180,000 in a real estate investment fund, and an IRS audit cost him nearly $40,000.  By 2008, defendant was under great stress from his financial situation.  He testified he was suffering from nightmares in which he relived his childhood trauma.

In 2006, defendant started working at SiPort.  In late 2007, SiPort hired Pugh as the Vice President of Operations, making Pugh defendant's supervisor.  At first, defendant's relationship with Pugh was good, but they soon began having differences.  Defendant felt Pugh was making unwise choices in purchasing parts and hiring vendors and employees, so defendant complained to upper management.  Defendant believed Pugh was setting him up for failure.  Defendant considered the possibility he might have to leave SiPort, but he declined another job offer and remained at the company.

3.                    *Facts of the Shooting*

On October 28, 2008, defendant purchased a Taurus PT111 Millennium Pro—a compact or subcompact semiautomatic nine-millimeter pistol—at Target Masters West, a firing range and gun shop in Milpitas.  Defendant took possession of the gun on November 12, four days after the 10-day waiting period had expired.  The gun came with two 10-round magazines.  At trial, defendant testified that he bought the gun "for self-

5

defense and entertainment."[3]  He stated that he "used to have a hobby of traveling and camping," and that he had felt unsafe when camping.  He also claimed he had been inspired by a Chinese shooting competition he had seen on television.  Defendant's wife testified that defendant had been excited by the success of the Chinese shooting team at the Olympics.  She also testified they had not been camping since the birth of their children.  Defendant never told her he had bought the gun.

On Friday, November 14, 2008—the day of the shooting—defendant and his wife were planning to hold a birthday party for their youngest son in the evening.  They planned to have a cake, and defendant planned to buy candy for the twins.  After dropping off their youngest son at daycare, defendant arrived at work at around 9:30 or 10:00 a.m.  At 10:48 a.m., defendant received an email from Pugh scheduling a meeting at 11:00 a.m.  Defendant testified he did not know he was about to be terminated.

Shortly after 11:00 a.m., defendant met with Pugh and Lewis in Pugh's office.  Pugh said business was bad, so the company and the board had decided to make cuts and let defendant go.  Defendant testified he felt shocked and "something was pinching my heart."  He was consumed with fear of financial failure and thought he would go bankrupt.  Defendant asked to speak with Agrawal and Aiman Kabakibo, Vice President of Engineering.  After some hesitation, Pugh and Lewis agreed.  Lewis then left the office to find Agrawal and Kabakibo, leaving defendant alone with Pugh.

In his testimony, defendant denied having any thoughts about retaliation or revenge at that point.  However, Pugh later sent an email to Lewis in which Pugh quoted defendant verbally threatening him as follows:  "[Y]ou will pay for this.  You will see.  I wish you go to hell.  You will not escape from earth."  Defendant denied issuing these threats.

---

[3] Defendant testified through a Mandarin interpreter.  All quotations from defendant's testimony are taken from the interpreter's English translation.

6

Shortly thereafter, Lewis returned to Pugh's office with Agrawal and Kabakibo. Agrawal apologized to defendant and said it was the board's decision to terminate defendant's employment. Pugh complained that he had assigned a project to defendant five months ago, and the task was still incomplete. Defendant claimed, "It wasn't my delay. It was because you didn't assign the job right." He also stated, "This will devastate me. I will be back." Defendant requested a three-month extension. Agrawal asked defendant to give them a few minutes to discuss the matter.

Defendant returned to his cubicle and called his wife to tell her SiPort had terminated him. She testified that he sounded frustrated and panicked. Defendant kept repeating, "[I]t's not fair, it's not fair," and he said, "They can't do this to me." Defendant's wife tried to assuage him and reminded him that she still had her job.

Meanwhile, Agrawal, Kabakibo, and Lewis discussed the situation in Agrawal's office for about ten minutes. Kabakibo suggested they bring defendant back as a consultant for a few months. Agrawal agreed, but he emphasized that the termination of employment would stand. Kabakibo then brought defendant back into Agrawal's office, and Agrawal offered defendant the consulting position on a contract basis. Defendant accepted it. Agrawal asked defendant to make a list of tasks he would be able to perform. Defendant agreed to do so, but he felt the offer was not serious and the company was simply stalling. Nothing was put in writing, and there was no discussion of pay rates. Lewis gave defendant some paperwork to sign, but defendant declined to sign the documents and returned to his cubicle.

After defendant left Agrawal's office, Pugh told Kabakibo about defendant's threats. Pugh held up a piece of paper with notes he had made to document the threats. At trial, Kabakibo testified that Pugh told him defendant said he (Pugh) would "not escape from earth" and that he (Pugh) should "go to hell."

At his cubicle, defendant tried to check his email but discovered he had been disconnected from the network. Someone from the IT department told defendant he

7

could delete personal files from his computer, so he began to do so. After eating his lunch, defendant left the building.

At around 12:49 p.m., defendant went to Reed's Indoor Range in the City of Santa Clara to buy ammunition. He told the salesman he wanted defensive or hollowpoint ammunition as well as practice ammunition. The salesman offered defendant a 20-round box of hollowpoint rounds, but defendant said he wanted a larger quantity, so the salesman sold him a 50-round box of Winchester Super-X Silvertip hollowpoint rounds. Defendant also purchased a 50-round box of CCI Blazer Brass full metal jacket practice ammunition. The hollowpoint rounds cost $53—four times more than the practice rounds. When asked at trial why he bought the ammunition, defendant replied, "Because after I got the gun, I was supposed to buy some bullets to keep them at home." He also thought he would practice to improve his marksmanship. He denied he bought the ammunition with the intent to exact revenge. He testified he bought the larger quantities because they were cheaper.

At around 1:10 p.m., defendant went to the Sunnyvale branch of the Technology Credit Union. He deposited three checks totaling $11,551, and he withdrew $3,000. At trial, defendant admitted this was an unusually large amount of money for him to withdraw. He testified he withdrew the money because he was too ashamed to go home, and he thought it would be more convenient to have the cash with him.

Defendant testified he then drove back to the company, parked outside the building, and thought about how his life was a complete failure. He retrieved the gun, which had been stored in the cargo area of his vehicle, and he loaded it with the ammunition he had purchased. Defendant testified that he only loaded one of the 10-round magazines; he denied loading the other magazine. He contemplated suicide and held the gun to his head, but thoughts of his children prevented him from pulling the trigger. He testified that he then decided to kill himself inside the company building. He

8

denied that he entered the building with the intent to shoot anyone else, and he could not recall putting on "different clothes."

At around 3:00 p.m., defendant entered SiPort with the gun in his right pants pocket. He had chambered one round, and the safety lock was disengaged. Witnesses saw defendant wearing a baseball cap and a gray coat or windbreaker. He appeared to be upset, with a strange look on his face. He went to Lewis's office and again requested a three-month extension. Lewis promised to pass along the request. Defendant then went to his cubicle to gather his personal items. Lewis arrived at his cubicle soon afterward to monitor his progress. On two or three occasions, defendant went to get a drink of water; Lewis followed him each time. Defendant testified, "I felt very, very awful at that time. It felt like during the cultural revolution when my parents were being paraded on the street. I felt that I was a thief, and I was being watched."

Defendant called his wife from his cubicle and told her management had denied his request for an extension. He told her they had offered him a contract position, but that he did not believe it was genuine. He said he was cleaning out his belongings while someone was standing in his cubicle watching him like a prisoner. His wife testified that he sounded desperate.

Defendant testified that at around 3:45 p.m., he needed to use the bathroom, but Lewis would not let him go. Lewis was sitting in a chair with wheels, so he grabbed the chair and pushed it out of the way. He walked out of his cubicle and headed toward Agrawal's office. He said he had wanted to go toward the bathroom, but Lewis walked next to him and forced him to walk toward Agrawal's office. Witnesses testified that Lewis followed defendant into Agrawal's office. Lewis closed the door to Agrawal's office. Pugh and Agrawal were already there. Agrawal was sitting at his desk. Pugh was sitting in the corner.

Witnesses outside the office heard a verbal confrontation. One witness heard Agrawal tell defendant, "Jing, calm down. Calm down. You don't want to do this."

9

Another witness heard Agrawal say something to the effect of "hey, we don't have to do it like this." Defendant said, "I don't care," and added, "I'm going to go to jail anyway." Agrawal responded, "No, no, no, Jing. Don't worry about that. We'll work it out." One witness then heard a slight rumble, followed by gun shots. Several witnesses heard multiple gun shots. Another witness heard a cry of anguish from Pugh during the shooting. That witness could see into Agrawal's office through a glass window. He saw defendant with a gun in his hand. Defendant appeared to be leaning forward and looking underneath Agrawal's desk. When he saw defendant reach for the door handle, the witness yelled for everyone to get out of the building.

Defendant had fired six shots, killing all three victims. All three were shot at least once in the head. Pugh suffered gunshot wounds to the head, the chest, the right buttock, and the right wrist forearm area. Agrawal was shot twice in the head. Stippling near one of the wounds showed that Agrawal had been shot at close range. The bodies of Pugh and Agrawal were found under Agrawal's desk.

Witnesses who saw defendant leave the building testified he was walking casually and he appeared calm and normal.

4. *Defendant's Testimony About the Shooting*

Defendant testified that when he entered Agrawal's office, he once again requested a three-month extension, but Agrawal did not answer. Defendant then asked for an extension of one and a half months. He testified, "I was very ashamed. I felt that I was a dog begging for a bone. I was very, very ashamed, and I was in a lot of pain. I have never felt so much pain before. I was extremely painful and extremely desperate. That state of mind I cannot describe with words." He then pulled out the gun, pointed it at his head, and said, "I will die in your face." Defendant testified that Agrawal told him to calm down and said, "Jing, don't do this." On cross-examination, defendant admitted he said something similar to "I'm going to jail anyway. You guys will send me there. I

don't care." He testified he said this because he knew it was illegal to carry a gun in a public place.

Defendant testified that Pugh told him to calm down and to think of his children. Defendant responded, "you shut up." Pugh then pushed or threw a chair towards defendant. Defendant put his hands up to defend himself, and the chair pushed against his left elbow. Defendant testified, "At that point, I felt that my gun went off. Because the chair was high up there, I think the gun shot the lower half of him, I think it was under the chair." As to his state of mind, defendant said, "I wasn't thinking at that point." He said he could remember the first inadvertent shot, at which time he felt someone grabbing his shoulder. He heard someone call his name and he felt he was being pulled downward and backward. He further testified as follows: "And then I heard another bang, bang. I felt again as if I was being pushed into the water, and I was being drowned. Just like in my nightmares, I was using all of my strength to try to get away and push them away. After that, I recall the pong, pong sound. It was my feeling or my understanding afterwards that must have been—that must have been the sound of the gun. I don't remember exactly how many times the gun sounded." Defendant could not recall shooting Agrawal or Lewis, and other than the first shot, he could not recall shooting Pugh. He asserted that he had never intended to kill anyone at any point.

Defendant testified the next thing he could remember was driving in his vehicle at an intersection where he nearly collided with a white pickup truck. He could not recall leaving the building and getting into his vehicle. He testified that his brain had gone "white," and there were so many thoughts in his mind that "it was like a traffic jam" and he could not focus. He could not figure out what had just happened, and he began crying out for his mother. He then recalled pointing the gun at Pugh when "the gun sounded." At that point, defendant pulled off the road and parked near a familiar building. He found his gun in his right pocket, and when he removed the magazine, he saw there were only a few bullets left. At that point he thought something must have gone wrong.

11

5.          *Subsequent Events*

Shortly after the shootings, defendant called his wife. He told her she would need to take care of their children by herself because he was leaving. The Mandarin word he used for "leaving" has two meanings—either "moving from one place to another," or "dying." Defendant's wife became alarmed and repeatedly asked what had happened, but he refused to answer her. When she asked where he was, he said only that he was outside and repeated that he was leaving. He hung up. She tried to call him back, but her calls went to voicemail. She believed he had turned off his cell phone.

At around 4:00 p.m., defendant returned to the Technology Credit Union. He deposited a check for $7,000 and withdrew $2,000. A few minutes later, he got in line again and requested a withdrawal of $40,000 from another teller. The teller asked if a cashier's check would suffice, but defendant insisted on cash. The tellers became suspicious and approached the manager to discuss the request. Defendant appeared fidgety or antsy, and he was pacing back and forth. After about 20 or 30 minutes, the manager approved a withdrawal for $20,000 in cash, but defendant declined to accept it and left immediately.

Defendant drove to a Fry's Electronics, where he parked his rental car for a while. He then drove to a Ranch 99 grocery store, where he bought some food items that, according to his testimony, were for the children's birthday party that evening. He drove around Sunnyvale and Santa Clara for some time, and returned to the Fry's Electronics, where he bought some candy. He spent the night sleeping in his rental car, parked on a street next to Fry's Electronics.

The next morning, defendant bought two newspapers and saw articles about the shootings. He testified that "all of a sudden [] I felt my head just exploded, because according to the newspaper, I killed three people. At that time, I felt that I was an unforgivable criminal." He testified this was the first time he realized he had killed three people.

12

Defendant then called his wife but she did not answer. At around 10:15 a.m., she saw that he had called and she called him back. He started crying and apologized to her repeatedly. He told her he wanted to surrender to the police, but he was worried they would shoot him. She told him she would call the police and relay his concern. When the call was over, she called the police and told them he wanted to surrender and that he had no gun. She tried to call defendant back, but he did not answer.

The police located defendant in Mountain View by using the GPS coordinates of his cell phone. They took him into custody in front of a Smart & Final grocery store with his vehicle parked nearby. Police found a gun in the rear cargo area of the vehicle. The gun was stored in a black plastic case inside a green bag. The bag also contained two boxes of ammunition and an empty magazine. The other magazine, found inside the gun, was also empty. Police found 14 loose rounds of the practice ammunition in the bag. The prosecution cross-examined defendant about the existence of the loose rounds. Defendant testified that, after the shootings, he emptied the remaining rounds out of the magazine that had been in the gun. He testified the rest of the loose rounds had fallen out of the box when he loaded the gun before the shootings. He denied he had taken the second 10-round magazine into the building with him during the shootings.

6.              *Mental Health Evidence*

    a.              *Lay Witness Testimony*

Defendant testified to several incidents of atypical mental activity. He said when he was in college, another student accidentally bumped into him with his elbow, causing defendant to flashback to an earlier incident of abuse. Defendant learned from other students that he was unconsciously talking to himself or to people who were not there. While in custody after the shootings, defendant experienced audio and visual hallucinations. He frequently heard a high pitched buzzing sound in his head. His wife and children once appeared to him in his cell, and his children sang a Chinese song from his childhood. Once, when defendant was meeting with his attorney, he saw his youngest

13

son running towards him and calling his name, at which point he lost awareness of his surroundings. On another occasion, he saw his deceased sister in his cell, cooking a meal of fish for him. In 2010, defendant reported to his doctor that he had heard the voice of his deceased father speaking to him. His father scolded him for keeping a dirty cell, and defendant responded to him. He told another doctor that he had seen visions of his father in heaven. At one point, while in custody, defendant became extremely despondent and wanted to commit suicide. In August 2011, defendant was held for evaluation under Welfare and Institutions Code section 5150.

Defendant's wife testified that she once saw defendant talking to himself around 1999 or 2000. They were on a long trip, and defendant was driving. He appeared to be having a conversation with somebody who was not there. He was arguing and nodding his head, as if the person was talking to him and he was talking back. On other occasions, defendant and his wife would be engaged in conversation and he would forget what she had told him. She also testified that he would sometimes bump into people in public without realizing it.

Defendant's older sister testified about the harsh circumstances of defendant's childhood. Defendant was born during the Great Famine, and his mother was forced to nurse him with water because she had no milk. When defendant was around six to eight years old, he fell out of a tree and hit his head, knocking him unconscious. Defendant's sister had seen him engaged in irregular behavior, such as talking to himself. After the death of another sister, defendant banged his head against a wall and pulled his hair out.

Dr. Stephen Ling was defendant's family physician from 2001 to 2005. He first treated defendant in August 2001, when defendant came to him complaining of work-related issues, including loss of appetite, fatigue, abdominal pain, and poor sleep. Defendant was working long hours and under stress due to his poor relationship with his boss. Dr. Ling diagnosed defendant with an early form of depression. He prescribed trazodone, an antidepressant. After defendant reported suffering drowsiness, Dr. Ling

14

changed the prescription to ambien.  Dr. Ling never observed any signs of psychosis, and defendant never reported having audio or visual hallucinations.

b.                *Expert Witnesses for the Defense*

Dr. David McMaster Echeandia, a forensic and clinical psychologist, testified for the defense as an expert in forensic psychology and mental status examinations.  The trial court had appointed Dr. Echeandia to evaluate whether defendant suffered from a mental disease or defect, whether it existed at the time of the shootings, and whether it amounted to legal insanity.  Dr. Echeandia interviewed defendant for three hours in July 2012 and offered the following opinions:  Defendant had a long history of major depression and elements of posttraumatic stress disorder.  The depression preceded the date of the shooting and was present at the time of the shooting.  Events on the day of the shootings were a factor in causing defendant to suffer a psychotic break.  This made defendant susceptible to a loss of touch with reality and decreased his capacity for thinking and behaving rationally.  Specifically, defendant suffered from a dissociative disorder at the time of the shooting.  A dissociative disorder causes a person to become detached from reality and unconscious of their actions.  Defendant was not fully conscious of what he was doing and therefore could not assess the right or wrong of what he was doing.  As a consequence, defendant was incapable of distinguishing right from wrong, either morally or legally.  Dr. Echeandia concluded that defendant was therefore not legally sane at the time of the offenses.

Psychiatrist Pablo Stewart testified for the defense as an expert in psychiatric forensics.  Dr. Stewart was retained by defendant's attorneys and interviewed defendant four times in 2010 and 2013.  Dr. Stewart described defendant as "incredibly consistent in his presentation."  Dr. Stewart did not believe defendant was malingering or falsifying his history of symptomology.  Dr. Stewart offered the following opinions:  Defendant suffered from a brief psychotic disorder and a paranoid personality disorder at the time of the shootings.  These disorders caused defendant to suffer a break from reality at the time

15

of the shootings.  As a result, defendant was unaware of the nature and quality of his actions and unable to distinguish between moral or legal right and wrong.  On this basis, Dr. Stewart concluded defendant met the statutory requirements for insanity.

Dr. Roger Karlsson, a forensic psychologist, testified for the defense as an expert in forensic psychology and mental status examinations.  The trial court had appointed Dr. Karlsson to evaluate defendant's competence to stand trial.  Dr. Karlsson interviewed defendant twice in February 2012.  He was focused solely on defendant's mental state at the time of the examination, not at the time of the shootings.  Dr. Karlsson administered the Miller Forensic Assessment of Symptoms Test to defendant.  This test is used to assess whether the subject is attempting to fabricate psychological symptoms.  Defendant scored a zero on this test, which meant that the chance he was malingering was substantially decreased.  Based on the test results and the two interviews, Dr. Karlsson concluded defendant was not malingering or feigning.  He opined that defendant was suffering from a "psychotic disorder not otherwise specified," but that he was not delusional or paranoid.  Dr. Karlsson also concluded that although defendant suffered from a mental disorder, he was competent to stand trial.

Dr. Michael Echols, a former psychologist for Santa Clara County, testified for the defense as an expert in mental status examinations.  The trial court had appointed Dr. Echols to examine defendant in August 2012 to evaluate defendant's ability to represent himself.  Dr. Echols interviewed defendant twice.  He limited his inquiry to defendant's status at the time of the interviews, not at the time of the shootings.  At that time defendant was taking 10 milligrams of Celexa, an antidepressant.  Dr. Echols observed defendant behaving normally; there was no evidence of delusions, paranoia, or flashbacks.  Dr. Echols did not believe defendant was malingering.  He diagnosed defendant as suffering from a depressive disorder.  Although defendant was "functioning adequately," Dr. Echols concluded he was not competent to represent himself.

16

c. *Expert Witnesses for the Prosecution*

Psychologist Kris Mohandie testified for the prosecution as an expert in forensic psychology. Dr. Mohandie interviewed defendant twice in November 2012. He found defendant's thinking to be organized and linear with "no evidence of thought dysfuction." Defendant did not claim or demonstrate at the time that he was hearing voices or responding to internal stimuli, and Dr. Mohandie did not observe anything indicating that defendant was experiencing hallucinations.

Dr. Mohandie attempted to administer the Structured Interview of Reported Symptoms (SIRS) test to defendant. But he discontinued the test within five minutes because defendant was placing excessive reliance on the interpreter, and Dr. Mohandie was concerned this would affect the reliability of the test. Instead, Dr. Mohandie administered the Minnesota Multiphasic Personality Inventory 2 (MMPI-2) test. The MMPI-2 is a self-administered test consisting of true/false questions worded at a sixth-grade English reading level. Dr. Mohandie consulted with one of the developers of the test, who advised it would be acceptable for defendant to use an interpreter to clarify certain questions. During the test, defendant frequently asked for clarification of the meaning of certain words. Dr. Mohandie generally deferred to defendant to decide how to respond.

Based partly on the test results and partly on defendant's narrative of the offense, Dr. Mohandie observed evidence that defendant was malingering, particularly as to the claim of a dissociative reaction. Dr. Mohandie opined that defendant was exaggerating psychotic symptomology. He found no reliable evidence of a dissociative disorder.

Dr. Mohandie diagnosed defendant with an acute adjustment disorder and a "personality disorder not otherwise specified," including elements of narcissism, obsessive compulsive disorder, and paranoid features. Dr. Mohandie disagreed with the conclusion that defendant had suffered a brief psychotic episode at the time of the shootings. As to the legal status of defendant's sanity, Dr. Mohandie opined that

17

defendant did not have a qualifying mental disorder and that defendant was capable of knowing the nature and quality of his actions. On this basis, Dr. Mohandie concluded defendant was legally sane at the time of the shootings.

Neuropsychologist Brent Hughey, an expert in forensic psychology, testified for the prosecution in the sanity phase only. The trial court had appointed Dr. Hughey to determine whether defendant was legally sane at the time of the offense. Dr. Hughey interviewed defendant for three and a half hours in June 2012. At the time, defendant was representing himself and had been researching an insanity defense.

Dr. Hughey testified that defendant appeared to understand what was going on and where he was. Defendant appeared to have an agenda or a script, focusing on his childhood, head trauma, and mood. Defendant's thought processes were clear, linear, and logical. Dr. Hughey diagnosed defendant as clinically depressed. The depression started back in 2001 with his prior employment problems. Dr. Hughey opined that defendant suffered from mild to moderate depression at the time of the offense. He also opined that, once in custody, defendant became more depressed and possibly psychotic for a period of time as the seriousness of the offense and its consequences began to weigh on him. Because defendant was exhibiting suspiciousness and narcissistic features, Dr. Hughey considered possible personality disorders, but he did not conclude this made defendant incapable of distinguishing right from wrong. Dr. Hughey saw no evidence defendant suffered from any kind of psychotic break or dissociative episode at the time of the shootings. Dr. Hughey concluded that defendant met all the criteria for legal sanity at the time of the offenses.

B. *Procedural Background*

In February 2010, a grand jury indicted defendant on three counts of murder. (§ 187.) As to each count, the indictment alleged defendant personally and intentionally discharged a firearm, proximately causing death. (§ 12022.53, subd. (d).) The indictment also alleged a multiple-murder special circumstance. (§ 190.2, subd. (a)(3).)

18

Defendant pleaded not guilty. In June 2012, defendant pleaded not guilty by reason of insanity.

Trial proceeded on a bifurcated basis. The guilt phase of the trial began on January 15, 2013. On March 8, 2013, the jury found defendant guilty on all counts and found all special allegations to be true. The sanity phase began on March 8, 2013. On March 22, the jury found defendant sane as to all counts. The trial court sentenced defendant to a total term of life without the possibility of parole consecutive to 75 years to life.

## II. DISCUSSION

### A. *Jury Instructions Regarding Provocation and Second Degree Murder*

Defendant contends the trial court failed to instruct the jury on "heat of passion second degree murder" in violation of his due process rights under the Fourth Amendment. Defendant acknowledges that the court properly instructed the jury that provocation may reduce first degree murder to second degree murder. He contends, however, that the court failed to distinguish the type of provocation required for voluntary manslaughter under heat of passion—which contains an objective "average person" component—from the type of provocation sufficient to negate the mens rea required for first degree murder, which contains no such component. The Attorney General contends there is no reasonable likelihood the jury misunderstood the instructions, and that any such instructional error would have been harmless. We conclude the trial court properly instructed the jury, and we find no reasonable likelihood the jury misapplied the instructions given to it.

### 1. *Procedural Background*

After the close of evidence in the guilt phase, the trial court used CALCRIM Nos. 520 and 521 to instruct the jury on the elements of murder, malice aforethought, and the degrees of murder. The instructions on first degree murder covered premeditation and deliberation as well as first degree murder by lying in wait. The court then instructed

19

the jury on voluntary manslaughter under heat of passion based on CALCRIM No. 570. In particular, the court instructed the jury that the required provocation for voluntary manslaughter under heat of passion "would have caused a person of average disposition to act rationally and without due deliberation, that is from passion rather than from judgment." Similarly, the court instructed the jury that "[i]n deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reached—would have reacted from passion rather than from judgment."

During a recess in the middle of the prosecution's closing argument, the jury submitted a note that said: "Please clarify the distinction between 1st and 2nd degree murder. Do we get a definition for second degree murder?" At that point, the trial court realized it had forgotten to instruct the jury with CALCRIM No. 522. The court then reinstructed the jury with CALCRIM Nos. 520 and 521, and added the following instruction based on CALCRIM No. 522: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." The prosecution then resumed its closing argument. At no point did defendant object to these instructions or request any pertinent modification.

In closing argument, after addressing self-defense, the prosecution described provocation as "another defense," adding, "This is the instruction that we accidentally left out of your packet that was read this morning." The prosecutor then distinguished it from the type of provocation required for voluntary manslaughter under heat of passion: "This would reduce first degree murder to second degree murder. And we'll talk about a kind of provocation that reduces manslaughter too in a minute." Before addressing voluntary

20

manslaughter under heat of passion, the prosecutor argued that "the provocation would have to be such that it negates his specific intent, his premeditation, his deliberation or his lying in wait." Subsequently, in separately addressing voluntary manslaughter under heat of passion, the prosecutor set forth the objective requirement of the element of provocation.

    2. *Legal Principles*

    First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Second degree murder is an unlawful killing with malice, but without premeditation and deliberation. (*Ibid.*) Provocation sufficient to negate premeditation and deliberation may reduce murder from first to second degree. (*People v. Wickersham* (1982) 32 Cal.3d 307, disapproved on other grounds by *People v. Barton* (1995) 12 Cal.4th 186; *People v. Thomas* (1945) 25 Cal.2d 880, 903; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.) Furthermore, if the provocation "would cause an emotion so intense that an *ordinary person* would simply *react*, without reflection," then the offense may be reduced to voluntary manslaughter under heat of passion. (*People v. Beltran* (2013) 56 Cal.4th 935, 949, italics added and in original.) This last requirement is an objective standard. "The question is whether the average person would *react* in a certain way: with his [or her] reason and judgment obscured." (*Ibid.*, italics in original.)

    We review de novo the legal adequacy of a jury instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1211.) "We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) An instruction " ' "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citation.] If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged

21

instruction in a way" that violates the Constitution.' " (*People v. Ngo* (2014) 225 Cal.App.4th 126 [quoting *Middleton v. McNeil* (2004) 541 U.S. 433, 437].)

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694.) " 'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, [the appellate court] will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." ' " (*People v. Hart* (1999) 20 Cal.4th 546, 623-624 (*Hart*).)

3. *The Trial Court Properly Instructed the Jury on Second Degree Murder*

Defendant contends the trial court failed to instruct the jury on "the elements of heat of passion second degree murder." We disagree. First, the trial court properly instructed the jury using CALCRIM No. 520 on express malice murder in the first or second degree. Second, the trial court properly instructed the jury using CALCRIM No. 521 that first degree murder (apart from lying in wait) requires premeditation and deliberation, which the instruction defined in detail. Third, the trial court properly instructed the jury using CALCRIM No. 522 that provocation could reduce first degree murder to second degree murder. These instructions set forth the law that would have allowed the jury to find second degree murder on the ground that provocation had

22

negated the existence of premeditation or deliberation. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001 (*Jones*) [no error in giving CALCRIM Nos. 521 and 522].)

Defendant contends the trial court failed to distinguish "heat of passion second degree murder" from voluntary manslaughter under heat of passion. We disagree. The trial court properly instructed the jury using CALCRIM No. 570 on the elements of heat of passion required to reduce murder to voluntary manslaughter. The court gave this instruction separately from the instruction on the possibility of provocation reducing first degree murder to second degree murder. Nothing in either of these instructions told the jury that the provocation necessary to reduce first degree murder to second degree murder required a finding that such provocation would have caused an ordinary person to react in a certain way.

The crux of defendant's argument is that the jury could have been misled into thinking that only an objectively reasonable type of provocation would have sufficed to reduce first degree murder to second degree murder. While CALCRIM No. 522—to distinguish it from the provocation necessary for voluntary manslaughter under heat of passion—could have explicitly instructed the jury that provocation sufficient to negate premeditation or deliberation need not be objectively reasonable, any ambiguity in this regard was harmless, as it was not reasonably likely the jury was confused on this point. The voluntary manslaughter under heat of passion instruction made clear that the "objectively reasonable" requirement for provocation was an element of voluntary manslaughter under heat of passion. And the trial court never used the phrase "heat of passion" in connection with the second degree murder instructions. Furthermore, the prosecution, in closing argument, distinguished the level of provocation required for voluntary manslaughter under heat of passion from that necessary to reduce first degree murder to second degree murder. Therefore, there was no danger the jury would have confused these distinct requirements.

Defendant acknowledges that his arguments were rejected by the Second District Court of Appeal in *Jones*, *supra*, 223 Cal.App.4th 995. (See also *People v. Hernandez*, *supra*, 183 Cal.App.4th at p. 1335 [approving of CALCRIM No. 522].) He contends *Jones* was wrongly decided. We disagree. We find *Jones* persuasive and we adopt its holding as to this claim.

Finally, we note that defendant never requested a pinpoint instruction or clarification of the given instructions. His failure to do so forfeited his claim on appeal. (*Jones*, *supra*, 223 Cal.App.4th at p. 1001, citing *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Defendant argues that his trial counsel was ineffective for failing to request a clarifying instruction. However, as noted by the Attorney General, trial counsel may have had a tactical reason for not seeking such an instruction: Convictions on second degree murder would likely still result in an aggregate sentence much longer than defendant's remaining life expectancy. Therefore, defense counsel could have strategically focused his closing arguments on manslaughter and the insanity defense. Counsel may have eschewed claims of provocation, since reliance on a provocation theory could have undermined the argument that defendant was not conscious of his actions at the time of the shootings. On appeal, defendant now criticizes trial counsel's tactics and invites us to second-guess them, but we decline to do so. (*Hart*, *supra*, 20 Cal.4th at pp. 623-624.)

For all these reasons, we find this claim without merit.

B. *Administration of the MMPI-2*

Defendant contends the trial court erred by allowing the prosecution's mental health expert to administer the Minnesota Multiphasic Personality Inventory 2 (MMPI-2) test to him. Specifically, defendant contends the trial court failed to make the threshold determination that the test bore "some reasonable relation" to his mental state as required by subdivision (b)(1)(B) of section 1054.3. He further argues that the test fails to meet this criterion because the test is culturally inappropriate for a Chinese immigrant such as

24

himself. The Attorney General contends the trial court did not err, and that defense counsel forfeited this claim by failing to press the court for a ruling on the matter.

In the alternative, defendant argues that his trial counsel was ineffective for failing to obtain a ruling from the court and for failing to present evidence that would prove the unreliability of the test as applied to defendant.

1. *Legal Principles*

Section 1054.3 sets forth a criminal defendant's discovery obligations, among other things. If a defendant places his or her mental state in issue, section 1054.3 grants the trial court discretion to order the defendant to undergo examination by the prosecution's expert. "Under section 1054.3(b)(1), the court *may* grant the People's motion to compel a further examination by a prosecution-retained expert. In deciding how to exercise its section 1054.3(b)(1) discretion, the trial court may consider the extent to which such an additional examination is needed, in light of any existing court appointments, to rebut the defense's proposed expert testimony." (*Sharp v. Superior Court* (2012) 54 Cal.4th 168, 176, italics in original.) Subdivision (b)(1)(B) provides, in part: "The prosecuting attorney shall submit a list of tests proposed to be administered by the prosecution expert to the defendant in a criminal action or a minor in a juvenile proceeding. At the request of the defendant in a criminal action or a minor in a juvenile proceeding, a hearing shall be held to consider any objections raised to the proposed tests before any test is administered. Before ordering that the defendant submit to the examination, the trial court must make a threshold determination that the proposed tests bear some reasonable relation to the mental state placed in issue by the defendant . . . ." (§ 1054.3, subd. (b)(1)(B).)

"We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard." (*People v. Ayala* (2000) 23 Cal.4th 225, 299 (*Ayala*).)

## 2. *Background*

After defendant in pretrial proceedings sought to introduce expert testimony regarding his state of mind, the prosecution asked the trial court to appoint Dr. Kris Mohandie to evaluate defendant. Defendant, citing section 1054.3 and Fifth Amendment case law, raised several procedural issues not at issue in this appeal and asked the court "to provide guidance for the prosecution as to the procedure for going about having the evaluation done of my client." The trial court granted the prosecution's request to have Dr. Mohandie evaluate defendant. The prosecution then notified defendant that Dr. Mohandie would attempt to administer the MMPI-2 and the Structured Interview of Reported Symptoms (SIRS) test.

At a subsequent hearing on the scope of Dr. Mohandie's examination, defendant objected to the administration of both tests. Defendant stated, "[W]e have less objection" to the MMPI-2 but "we have strenuous objection" to the SIRS. Defendant argued that the SIRS was designed to determine whether the subject is malingering at the time of the test, and that this determination was not relevant to the issue of whether defendant was insane at the time of the offenses. Citing section 1054.3, defendant argued that the test did not bear any "reasonable relation" to the mental state at issue. Defendant made no objection to the MMPI-2 on the ground that it was culturally inappropriate for a Chinese immigrant.

The trial court acknowledged its lack of familiarity with the tests, but responded, "[I] would believe that the doctors and those who formulate that test and are interviewing defendants post crime would recognize the fact that there's some limitations within the test itself. I'm just talking about in general. And so the limitation of tests, which you've illustrated, I think the makers of the test presumably were aware of that. And so there has to be some built-in safe guards [*sic*] to form some opinion based upon whether or not the defendant is fabricating his prior diagnosis by its [*sic*] own doctors." On this basis, the court made a tentative ruling that Dr. Mohandie would be allowed to use the tests. The

26

court also stated it would further review the requirements of section 1054.3 in light of defendant's objection. However, the record contains no further argument, findings, or rulings on this issue, and defendant never raised it again.

### 3. *The Trial Court Properly Allowed Dr. Mohandie to Administer the MMPI-2*

As an initial matter, we consider defendant's argument that the trial court's ruling is subject to de novo review because the issue is one of statutory interpretation. But the words of section 1054.3 are clear, and their meaning is not in dispute here. As noted above, we generally apply an abuse of discretion standard of review to rulings on discovery matters. (*Ayala*, *supra*, 23 Cal.4th at p. 299.) Defendant argues that the statute mandates a threshold finding: "the trial court *must* make a threshold determination that the proposed tests bear some reasonable relation to the mental state placed in issue by the defendant . . . ." (§ 1054.3, subd. (b)(1)(B), italics added.) But the decision whether to allow the prosecution's expert to examine the defendant is permissive: "the court *may* order that the defendant or juvenile submit to examination by a prosecution-retained mental health expert." (§ 1054.3, subd. (b)(1), italics added.) Furthermore, although defendant characterizes the trial court's tentative ruling as a failure to make the required threshold determination, the court implicitly made such a determination. Although the court did not use the phrase "reasonable relation," the court considered the substance of defendant's objection and overruled it. Accordingly, our review is limited to the correctness of that ruling, and we will apply the abuse of discretion standard.

In a pretrial hearing, defendant objected to testing on the ground the test would only measure his state of mind at the time the test was administered, not his state of mind at the time of the offense. Even assuming this to be true, Dr. Mohandie never testified that the test measured defendant's state of mind at the time of the shootings. While Dr. Mohandie opined that defendant was exaggerating his symptoms at the time of the offense, he based this opinion on defendant's own actions and statements describing the offense. For example, Dr. Mohandie testified, "[W]hen I looked at the information that

27

was closest in time to the offense in terms of Mr. Wu's awareness of what was going on, he was very aware and articulated as such to the detectives, when taken into custody, what was going on. He also had communications with his wife on either side of what happened—allegedly happened—in that office. And so that is inconsistent with any Dissociative Disorder. So I did not find that there was any reliable evidence of a Dissociative Disorder." As to the possibility of malingering, Dr. Mohandie testified that he observed "a discrepancy between what was being claimed and what the objective findings were of what Mr. Wu was experiencing that day and what he's later claiming . . . ." Dr. Mohandie gave several specific examples of such discrepancies.

Dr. Mohandie testified that he also observed evidence of malingering by defendant during his time in custody. Evidence of such in-custody malingering included, among other things, defendant's performance on the MMPI-2, "which indicated exaggeration of symptoms." Dr. Mohandie opined that defendant's in-custody exaggeration of symptoms was "presented in such a way as if to imply that there must have been impairment beforehand." Dr. Mohandie testified that such malingering constituted "retrospective embellishment." This testimony demonstrated the "reasonable relation" between defendant's performance on the MMPI-2 test and his state of mind at the time of the offense. In other words, evidence that defendant was feigning mental illness at the time of the test would also cast doubt on his claims regarding his state of mind at the time of the shootings. We thus conclude the trial court did not abuse its discretion by allowing Dr. Mohandie to administer the MMPI-2 to defendant.

Defense counsel alternately argues that his trial counsel was ineffective for failing to put forth evidence showing that the MMPI-2 bore no reasonable relation to his state of mind at the time of the offense. The premise underlying defendant's claim is that the test was culturally inappropriate for a Chinese immigrant with defendant's level of acculturation. But defendant put forth no evidence to support this premise. Instead, he points to numerous questions posed by trial counsel in the cross-examination of Dr.

Mohandie. Trial counsel's questions referenced academic studies raising doubts about the validity of the MMPI-2 as applied to non-English speakers or to Chinese immigrants having a low level of acculturation or assimilation.

Defendant acknowledges that an attorney's questions do not constitute evidence. Nonetheless, defendant argues that "it may be inferred from those questions that defense counsel had evidence at his disposal which showed that the MMPI was invalid as to certain groups of Chinese immigrants." Even assuming such evidence exists, it cannot be inferred that the MMPI-2 was invalid *as to defendant*. Dr. Mohandie opined that defendant's level of acculturation was moderate to high compared with the low level of acculturation possessed by the immigrants in the studies cited by defense counsel. Dr. Mohandie based this opinion on the fact that defendant had lived in the United States for 18 years, and had earned a graduate degree. By contrast, the subjects of the study, considered to have a low level of acculturation, had been in the United States for an average of 4.95 years. Furthermore, Dr. Mohandie testified that he had consulted with one of the developers of the MMPI-2 on the administration of the test to defendant, and the developer had approved of its administration to him.

On this record, we find no evidence to support the inference that trial counsel could have presented evidence that the MMPI-2 was invalid as to defendant. Accordingly, we find no deficiency in counsel's representation, and no reasonable likelihood of a more favorable outcome. We thus conclude defendant has not met his burden of showing ineffective assistance of counsel.

## C. *Prosecutorial Misconduct*

Defendant contends the prosecution committed misconduct in the sanity phase by arguing it would be unjust to the victims to let defendant go to a state hospital. The Attorney General argues that defendant forfeited this claim by failing to object, but that even if the argument was improper, he cannot show prejudice.

1. *Background*

In the guilt phase of the trial, the prosecution cross-examined defendant about whether he had talked to other inmates, some of whom had been in a state hospital, about defenses pertaining to his mental state:

"[Q.] Well, you talked to those other inmates and you discussed mental defenses and proceeding under mental defense yourself.

"[A.] I never talked to them about that. When we talked about the hospital, we were talking about the food, the quality of food at the hospital. And especially when they came back, some of them would talk about how many nurses there were and how some of them were beautiful.

"[Q.] So the idea of a state mental hospital as opposed to prison, that sounds better to you.

"[A.] How should I put this? I didn't have that concept before. And then I started to have some, um, mental hospital. No. I mean state hospital. I think the living environment would be better.

"[Q.] So the living environment for you would be much better in a state hospital as opposed to prison?

"[A.] That's what I heard from other inmates.

"[Q.] And that's what you believe?

"[A.] Yes, I believe that is true."

Defendant added he was aware the food would be better in a state hospital, and he was told he would have more freedom there. Defense counsel lodged no objections.

Similarly, in cross-examination during the sanity phase of the trial, the prosecution questioned defendant as follows:

"[Q.] You agree that you'd have a reason to lie about your mental illness; right?

"[A.] Can you explain? What did you mean 'reasons'?

"[Q.] Well, you prefer to go to the state hospital as opposed to prison; right?

30

"[A.]  I don't have that prefer [*sic*].  Because what is most important to me is the church and the library.  And both facilities offer that.

"[Q.]  You told us that there's better food at the hospital.

"[A.]  Prison food is also better food.

"[Q.]  More freedom for you at the hospital?

"[A.]  Not more freedom to me, but, generally, hospitals have more freedom than the prison.

"[Q.]  You would prefer to go to the state hospital as opposed to prison?

"[A.]  If we are free to choose, then I would go to the hospital."

Defense counsel did not object.

Prior to closing arguments in the sanity phase, the trial court instructed the jury based on CALJIC No. 4.01.  As relevant here, the court instructed the jury:  "A verdict of not guilty by reason of insanity does not mean the defendant will be released from custody.  Instead, he will remain in confinement while the courts determine whether he has fully recovered his sanity.  If he has not, he will be placed in a hospital for the mentally disordered or other facility or in out-patient treatment, depending upon the seriousness of his present mental illness.  [. . .]  So that you will have no misunderstandings relating to a verdict of . . . not guilty by reason of insanity, you have been informed as to the general scheme of our mental health laws relating to a defendant, insane at the time of his crime.  What happens to the defendant under these laws is not to be considered by you in determining whether the defendant is sane or insane at the time he committed his crimes."

In its closing argument in the sanity phase of the trial, the prosecutor accused defendant of feigning mental illness, calling him "cunning like a fox."  In the course of this argument, the prosecutor stated:  "Of course, he's gonna go with an insanity defense[,] that's the only defense he possibly could go with.  You know, he gave you statements even here in court that he wants to go to the state hospital.  That's where he

31

wants to go.  You know, he wants a cushy spot where he can have the freedom to go to church, the food, the pretty nurses, all of those things.  Don't do him that favor.  And that's not justice.  That's not right for Brian Pugh, for Marilyn Lewis, or for Sid Agrawal.  And that's not supported by the evidence."  Later in the argument, the prosecutor added that defendant had a motive for feigning mental illness because it "would be easier for him if they could believe that to find him insane in the case . . . would be a slap in the face to justice."

Defense counsel lodged no objections during these arguments.

2.                              *Forfeiture*

As an initial matter, we consider the effect of defense counsel's failure to object to the prosecutor's remarks.  The Attorney General contends the failure to object forfeited the claim on appeal.  Defendant, citing *People v. Lambert* (1975) 52 Cal.App.3d 905, 908 (*Lambert*), urges us to ignore counsel's failure to object and consider the claim on its merits.  As the *Lambert* court held, the general rule is that absent an objection to the alleged misconduct and a request for admonition, no claim of misconduct can be considered on appeal.  (*Ibid.*)  However, the court recognized an exception to this rule if: (1) the case is closely balanced with grave doubt on defendant's guilt, and the misconduct contributed materially to the verdict; or (2) the misconduct is of such a character that the harm could not be cured by any retraction of counsel or instruction of the court.  (*Ibid.*)  For the reasons below, we conclude the case was not closely balanced.  Nor were the results incurable by retraction or instruction.  Accordingly, we conclude defendant's claim was forfeited by his failure to object.  (See *People v. Medina* (1995) 11 Cal.4th 694, 760 (*Medina*).)

3.                    *Defense Counsel's Failure to Object Was Harmless*

Defendant alternately contends his trial counsel provided ineffective assistance by failing to object.  Accordingly, we consider this claim under the rubric of *Strickland* and its progeny.[4]

As to the first prong of *Strickland*, we agree with defendant that counsel should have objected.  The conditions of defendant's potential confinement were immaterial to the issue of his sanity.  (See *People v. Quartermain* (1997) 16 Cal.4th 600, 632.)  The Attorney General argues that the prosecutor's statements were permissible because defendant's preference for hospitalization over imprisonment was relevant to impeach his credibility.  But the prosecutor's remarks went beyond mere impeachment.  The prosecutor referred to a verdict of insanity as a "favor" to defendant and a "slap in the face of justice."  The prosecutor further sought to play on the jury's sympathies for the victims by invoking their names, arguing, "[t]hat's not right for Brian Pugh, for Marilyn Lewis, or for Sid Agrawal."  Even though the prosecutor also told the jury the latter statement was "not supported by the evidence," the prosecutor's remarks improperly appealed to the passions of the jury.  (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, rev'd on other grounds in *Stansbury v. California* (1994) 511 U.S. 318.)  Defense counsel should have objected and requested an admonishment.

However, to obtain relief, defendant must show he was prejudiced by counsel's failure to object—i.e., that a more favorable outcome was reasonably probable had counsel objected.  In the sanity phase of the trial, defendant bore the burden to prove by a preponderance of the evidence that he was insane at the time of the offenses.  On this record, defendant could not have met that burden notwithstanding the prosecutor's remarks.  Specifically, defendant had to prove that by reason of mental disease or mental defect, he was incapable of:  (1) knowing the nature and quality of his act;

_____

[4] The legal standards underlying a claim of ineffective assistance of counsel are set forth above in Section II.A.2.

33

(2) understanding the nature and quality of his act; (3) distinguishing what is legally right from what is legally wrong; or (4) distinguishing what is morally right from what is morally wrong. The prosecution presented overwhelming evidence disproving all of these prongs.

First, the evidence showed defendant not only knew and understood the nature and quality of his actions, he performed them in a deliberate, premeditated fashion. After leaving SiPort in the wake of his termination, his first errand was the purchase of ammunition. His testimony that he purchased the ammunition just prior to the shootings to practice at home to improve his marksmanship was not credible. And his testimony that he entered SiPort with the intent to kill himself was also not credible. His threats to Pugh established that his motive was revenge. He wore a coat and hat into the building, which witnesses described as atypical attire for defendant. Evidence found later in his vehicle—14 loose rounds in a plastic bag—suggested defendant had loaded both 10-round magazines. He killed three victims in six shots, with nary a stray shot. All three victims were shot in the head. Two had crawled underneath a desk in an apparent attempt to protect themselves. This evidence of a calculated, execution-style killing was deeply at odds with defendant's claims of unconsciousness or inadvertence.

The prosecution also presented overwhelming evidence that defendant was well aware of the moral and legal wrongness of his actions. While in Agrawal's office, just before shooting the victims, defendant admitted, "I'm going to go to jail anyway," showing he understood the illegality of carrying and brandishing a loaded firearm. Within minutes after the shootings, defendant called his wife and informed her she would be left with the responsibility to care for their children, showing he understood the broader consequences of his actions. He then turned off his cell phone, likely aware of the possibility that law enforcement would use it to locate him. He made two trips to the bank—both before and after the shooting—to withdraw large amounts of money. Defendant offered no credible explanation for doing so. The obvious inference is that

34

defendant contemplated the necessities of an extended flight and he knew law enforcement would track him if he used bank or credit cards.

In his testimony, defendant repeatedly offered dubious explanations for his actions. His claim that he felt no anger towards his victims was belied by his threats to Pugh and was inconsistent with other witnesses' descriptions of his demeanor before the shooting. His claim that he felt someone physically pulling or grabbing him just before shooting his gun contradicted the positioning of the decedents' bodies. His claim that he did not realize he had killed three persons until he saw reports in the newspapers the next morning was not credible. And although two mental health experts opined defendant had suffered a psychotic break or dissociative episode at the time of the shooting, their opinions necessarily hinged in large part on defendant's own claims regarding his state of mind. Because it is likely the jury rejected defendant's claims about his state of mind, it is likely they rejected the experts' opinions as well.

Finally, the trial court specifically instructed the jury using CALJIC No. 4.01 not to consider how defendant would be treated as a consequence of its verdict in the sanity phase of the trial. The record shows no indication that the jury did not or could not adhere to these instructions.

In summary, we see no reasonable probability that the outcome would have been more favorable to defendant in the absence of the prosecutor's remarks. (See *Medina*, *supra*, 11 Cal.4th at p. 760.) Accordingly, we conclude this claim is without merit.

Finally, as to defendant's claim of cumulative prejudice, we have identified only one potential source of prejudice, which we found to be harmless. There being no other potential prejudice to cumulate, this claim also fails.

### III.    DISPOSITION

The judgment is affirmed.

35

_____

                                      MÁRQUEZ, J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, ACTING P.J.


_____

MIHARA, J.


People v. Wu
H040066